The next matter, number 181876, United States v. Brian Moran Ms. Davis, how do you pronounce your client's name? Moran I would ask permission to reserve one minute for rebuttal. Ms. Davis Yes, you may have it. Ms. Davis Thank you. This case hinges on the concept of what constitutes mutual use, in this case of plastic bags, closed containers, stored by Brian Moran in his sister Alicia's storage unit. Mutual use is a necessary element for a finding of either actual authority or apparent authority to consent to a search of someone else's closed container. In this case, there was no mutual use, there was no appearance of mutual use, there was no claim of mutual use, and moreover, the police knew it each step of the way. They came there telling her, we want to search Brian's things, not your and Brian's things, not your things, not commingled things. This is because if we look at the history of the bags, they knew what happened from the beginning. A week before, Brian came to his sister's place, took the bags and put them in her storage unit, retaining the key. The very next morning, she calls the police, not as somebody who I think Brian is using drugs, I think he's selling drugs. Please stop him. My other brother has died of a drug overdose. I don't want that to happen to Brian. That's the very next morning. He's arrested that day, and later calls her to pick up his belongings. About a week later, there's another phone call, and he asks her specifically, will you move those bags? He directs her to move the bags because her storage unit has to be vacated for some kind of an inspection. That's all he asks her to do, move the bags, be the allied van lines, be the carrier. We know from the facts that the police knew at that time because they recorded the call and played the call. The very next morning, the very next morning they begin surveilling the apartment. They see that no one goes to the storage unit, so one of the police officers calls Alicia and says, will you come home? She comes home. They tell her we want to search Brian's stuff. She says, oh, yeah. During that phone call, I told him I didn't have the key to move the bags. I didn't know where the key was. He told me it's in his stuff. Let's go over to my car. In the car, she picks through his stuff, finds the key, goes to the unit. They open the door. What's the stuff she picks through? Is it a closed container that she opens? No, it's not a closed container. I don't know, Your Honor. You don't know from the record? I know that there was a backpack that they searched. Is that where the key is? We don't know. We can't tell from the record. I'm sorry, Your Honor. I don't know. I'm not saying it's not in the record because I don't remember where the key was. In other words, excuse me, in any event, there's no challenge here to the police taking possession of that key? No, as a matter of fact, she goes with him to the store. Okay. The question wasn't whether or not she was helping them. The question is whether she had authority. My question is whether the way she obtained the key by going through his stuff might support the government's inference that she had the ability to get into his stuff generally. Well, his stuff was a closed container within the storage unit. There's no question that it's her storage unit. You said when she got the key, she picked through his stuff. She got the key. So I'm trying to figure out... She got the key when he stored the bags there. And the reason I'm making that point, Your Honor, is because it shows that she wasn't mutually using the stuff in the bags. When the government tries to make the point that she was involved in this drug dealing, it was impossible because they knew that she had no access to the closed containers, the bags in her storage unit, because she didn't know where the key was until the night before. And then when the police came, she still hadn't retrieved it. It was still with his possessions in her car. So therefore, it would have been impossible for her to mutually use the contents of those closed containers. The police knew where everything was. I'm not sure the key in the end has much significance, but it can be argued both ways. But he had the key to her storage unit. That's correct. She, in order to move his stuff out of the storage unit, must have had access to the storage unit. And so there might be an inference that he consented to her having the key. I think that's Judge Garland's point. It was her key, Your Honor. It definitely was her key. She definitely had the right to consent to the search of the storage unit. Yeah. We're talking about the closed container within it. And the government's point that she had mutual use of the contents of that closed container because she was involved in the drug dealing. And I'm saying, no, that doesn't make sense. She never used any of the contents of those bags. She never claimed to have any authority which would be required, you know, parent authority because she said, these boxes, these are mine. It's got Christmas ornaments in it. That, those bags over there, that stuff, that's Brian's. Not it's ours. It's Brian's stuff. So it was very clear that there was no commingling. There was no claim of authority. She said from the beginning, this is Brian's stuff. Any authority he gave her was merely to move it like the allied van lines. He never told her to access it. However, the court and the government rely on an old phone call which I want to address from the year before, from I think it was four months before. During that phone call before the other brother dies, Brian calls her and asks her to help her by providing drugs to some customers while he's incarcerated at another time. The reason that that phone call really has no relevance to this case is because there was a clear break in any pattern of activity she may or may not have known about or been involved with. That's when she called the police and said put a stop to this. It defies reason to think that you're mutually selling drugs, mutually accessing these closed container of drugs, when as soon as bags came there the very next morning you call and say please stop it. Is the relevant person's understanding her understanding of whether she was involved or his understanding, the owner of the bag? It's whether or not she had mutual use of the bags, whether or not she accessed them. She did not access them. She didn't appear to access them. She didn't claim access to them. So whatever Brian thought in his jail, it doesn't matter. It's what the police knew. Actually, it's neither of that. It's the police's view. Was it reasonable for the police to think that she was involved in this drug deal? And the answer is no. The thing that makes it hard is the concept in a closed container of what's mutual use. What it is is getting inside there, putting stuff in and out like clothes, moving stuff around, picking through stuff. I guess what I'm saying, I get it. I'm just asking, if the owner of something says to have mutual use of my thing, and if at some point the person who's granted that authority to have mutual use on their own says I don't want anything to do with this person, I'm not going to be using their stuff anymore, does that change the question of whether they still have mutual use? Yes, it does, Your Honor. That doesn't give them actual use of it. They're not, like the cases where the courts have found mutual use, one duffel bag, two guys putting their clothes in and out of the same duffel bag, one computer, people opening the computer and using it, one to play movies, one to create documents, one to look at pornography. You're saying you open the container and you're doing stuff in there. Yeah, but usually I thought that. Not just the authority. It's more than the authority, and it's more than the authority to move, which in this case was all that Brian gave her was move. He didn't ask her in this So, for example, it might be if a lawyer forgets their briefcase in court and says, oh, they're closing the court to their assistant, will you run over and get my briefcase? That doesn't mean they have access to their assistant. It strikes me that Judge Bell on this question could go different ways if we're talking about the same property. But the property four months before is not necessarily the same as the property in March that is kept in this storage unit that the police opened despite her saying, no, that's not mine. It belongs to my brother. Logically, from the sequence of events, it would seem to be different property, and the government certainly did not put in any evidence that I saw that it is, in fact, the same property that was referred to in the November call. That's correct, Your Honor. It's four months later. It's different property. It's different activity for anyone in her family, and she tries to stop it in the best way she can by calling the police. And if the other brother died in that time period, the other brother died in that four-month time period? She says, she doesn't say the date that he died, but she says, I do not want to lose another brother when she calls the police. So I'm assuming it, but I don't really know. Thank you. Your Honor, may I please quote Randall Crum on behalf of the government? I want to first address this question about whether mutual use and how that plays out here, because it clearly is the centerpiece of the argument here. And I think it's far from clear from Matlock, which is talking about a premise as a room, what mutual use does mean in the context of this property, of this kind of property, and whether it, in fact, is always required that there be proof of actual use as opposed to authority to use or access to use, not authority to access, even if that is not, in fact, exercised. I would note that in a number of opinions cited in the government's brief, certainly when an apparent authority rationale is being relied on, they haven't required proof of actual use. A good example cited in the defense of property is this Court's decision in Marshall, which was videotapes, where a girlfriend led the police to videotapes. There was a search for items stolen during a burglary. It involved camera equipment. This Court held that the videotapes were within the scope of it. They further held that watching the videotapes, that would clearly be a sort of a closed container, was within the apparent authority, without requiring any proof that the girlfriend ever watched them or had ever... I understood Ms. Davis to be arguing that there was no... an objectively reasonable reason that the officer faced with the facts in March could not have concluded that the brother gave her any form of apparent authority over opening the bags that were in the storage container. You've heard me express some doubts about the utility of the November call, given the absence of evidence, that the property was the same and the different circumstances. So what is your best argument that despite the fact that she said to the police, no, those are my brother's things, that an objectively reasonable officer would have thought under those circumstances that she had apparent authority to consent? And the best argument is the parallel in the relationship between the two of them, as reflected in the calls and reflected in some of the conversations between Detective Bossy and that the Moran encoded language is telling his sister to deal drugs with him. In fact, she volunteers. He's asking his girlfriend, he says to his sister to teach her, suggesting there's some history of this. She says, no, I'll do it. And then there's a specific discussion. And therefore, an officer would assume that four months later, after these events, after she is in fact still dealing drugs for him. And this is an important point. Your Honor raised the question about whether the brother had passed away. I don't think the record shows that, but the record does show something else that's very important. Alicia testified that on a number of occasions, Detective Bossy did also, that she in the past had called him to have her brother arrested. There's no suggestion that those all occurred during that four-month period. In fact, the suggestion is that they went on over a period of years, that her concern about her brother and her reliance on him to try to get her brother arrested because of her fear for him, had continued before and after the time in which she was involved. Now, how does that help you? Well, it does because it shows that there's not a conflict between her saying, arrest my brother, and her I'm not saying. No, Victor, that concern was raised that there was sort of a tension, certainly defense counsel argued, that when she's saying, she's washed her hands of it, arrest my brother, that shows she's out of it. But that's not what the history shows. The history shows that there was a pattern of her calling on Detective Bossy to arrest her brother, including the period during which she was, in fact, involved in assisting him. Unlike in Rodriguez, you agree that she did not hold herself out to police as having the authority to go into the bag. She did not. I'm not. I don't know that it's clear what she did. She identified them to him as what they were looking for. Yes. She did not say specifically I. Correct. That's unlike Rodriguez. Well, it's not unlike, say, Marshall. Okay, but I guess, put Marshall aside for one second. One possible rule would be, if you do hold yourself out, the police can rely on that unless there's some obvious reason to disregard it. But in a case in which you don't hold yourself out, the police should ask, at least, do you have authority to access, to get into that before relying on it. That was not asked here of her. Right. And we, as you know, the only circuit, to my knowledge, to the top of that was the 6th Circuit. No, I haven't found a case in which the party that consented to the search of another's belongings did not hold themselves out as having the authority to give that consent. Well, I think, Your Honor, I disagree. Because what is it? A number of the cases we cite, Penny is one where they basically point them towards belongings. This was a drug dealing case. The police had evidence separately of a note that showed that the girlfriend was involved in the drug dealing. She leads them to the things. I don't think there was any suggestion that she said, and those are mine, or that I have authority. She pointed them out. Yeah. Sorry. If I've understood you, you just said the record is silent on that. David, Judge Barron's question was not about silence. It was about this situation in which there is an affirmative statement that they belong to somebody else. Well, there's an affirmative statement. Right. So just simple. Right. the consenting party, putative consenter, does not hold herself out as having the authority to get into the closed container, and identifies the closed container as belonging to another, in which a court has said, in that circumstance, the police need not ask whether she has the authority. Again, I don't, I would say Marshall's probably the closest case. Okay. But I don't, and I would have to look back, because I think one of the things that's important is that, and I do point this out in my book as well, and that's why I'm sort of fighting with the question. I don't mean to be, but I'm saying that in almost all of these cases, there is no other information before the officers other than what occurs during the search. Typical consensual searches, they come and they say. That's fine. I understand that. I understand the context. I get it. The new ground you would be asking us to break would be, even in a circumstance in which they do not hold themselves out as having the authority, and even in a circumstance where they have pointed out that it belongs to another, the background understanding could be enough to overcome that and free the officer from having to ask, do you actually have authority? Right? But I guess what I'm saying, I'm not sure that I agree with the proposition that that's breaking new ground, is that these are always context-specific and based on the totality of information. But you do agree with the proposition. You agree that that fairly states your proposition. Whether or not it's supported by the precedent, we can determine. I guess where I disagree with the proposition, or perhaps just would quibble with it a little bit, is the context defines what it means to say that the property is somebody else's. If they have no reason to, if somebody says, this is my brother's, but the police know that it's shared, they interpret that one way. What if it's unclear? Right. And that's another question. You're saying if it's unclear, they can still search it. I'm saying that where the totality of the information. Makes it ambiguous. It's a reasonable, you know, the standard is that of Terry. It's a reasonable probability standard. So there's a person of reasonable caution would believe that she has authority. That's the standard. Rodriguez says that specifically. So the standard is really whether, based on the information they have, including what she said. Wouldn't one think that a person of reasonable caution, by definition, would ask the question? Well, I think the question would be if they believe that they have the information based on what, and you're honest, I didn't get to complete the story. The one part that is significant is Detective Rossi was there, and he was the person who had the conversation with Alicia. And when she called him, she didn't just say, arrest my brother. She said, I was contacted by the supplier. He told, the supplier told him that Moran had identified me as the contact person. He wants me to pay him. Should I pay him? There's a lot that Detective Rossi knows before he gets there that suggests that she has. In November, right? No, this is in March. This is after he's arrested. Okay. So when she first contacts him to get him arrested, she said, I'm being contacted by his supplier. His supplier wants to be paid. What should I do? Should I pay him? To me, that's extremely significant because that's in March. That's just before his arrest. That's what leads to his arrest. And Miguel is the very person who's mentioned in the November calls as a supplier, and Alicia offers to set up a call with Miguel to Moran in one of these coded conversations. So Detective Rossi has reason to believe that Moran has identified her to his supplier as a participant, as a person who can make payments on his behalf. So that colors how they're going to interpret when she says, these are his things, and they come and say, we're looking for his belongings. We think they can take them. I guess this is a version of the question that maybe each of us is asking you, which is, you make a case that there is a case to be made that she had the authority. And the question is, why not take the same principle we use in infantile release with respect to scope of consent, where when there's an ambiguity and it could be easily resolved by just asking the question, are you actually consenting to me now opening the briefcase of another? Why don't we have that same principle here? There's a doubt as to whether it's not like she held herself out and we're asking her to look behind that. We're just trying to figure out what is she communicating to him, and that could be easily resolved by asking, are you saying you have the authority? If she says yes, all the facts you've given would provide a reason to think it would prove perfectly reasonable to trust her. But he didn't ask that, and the question is, why not require the same question there that we require in infantile release on the prior question of scope of consent? And then I think the answer would simply be that that hasn't been the precedent anywhere except in the Sixth Circuit, and every court to address the issue has looked at the facts and said, did they have a reasonable suspicion, essentially, to believe the person had authority to consent to the particular property issue? And that includes a case like Marshall, where it's watching videotapes and there's no evidence that the person actually ever watched them. The court has not said, should they have asked, did you watch these tapes, or do you use these? And it's not to say that the court couldn't have required it, but that is not the way the law has progressed. The standard is, as set forth in Rodriguez, is simply looking at what they knew, did they have a reasonable basis? If I've understood you correctly, the government is arguing that there shouldn't be a rule. It should not be when in doubt, ask. It should be fact-specific in every single situation. I thought that was what you were saying in response to Judge Barron's question about why don't we treat this like enfante ruis, and in case of doubt, the officers should and easily can ask. There was no reason not to ask the question. Would you answer my question? My question is, there's certainly no reason why it could not be done. Are you saying we should not adopt a rule, each case should be determined on its own facts? Yes, Your Honor, that is what we're asking. And there's no need for a per se rule, as in other reasonable suspicion contexts, when we look at the totality of circumstances to find if the officers have a sufficient basis. So sometimes you should ask, but you don't always have to ask. No, the failure to ask obviously can have consequences if in the end they don't have sufficient evidence. We think that they did here. The argument here is that based on everything they knew, based on the progress of the information that they gained, including finding a scale in her apartment, they had enough to believe she was a participant and thus had the joint access and control needed. Okay, thank you. Ms. Davis. First of all, access and control is not enough. There has to be mutual use and a mutual expectation of privacy in the property. The government keeps trying to push us back to the year before. He accrued drug debts. He told the supplier about her. Even though she did mention the supplier, that is true. In the current call about these bags, these bags came the next morning. She says, stop this. I'm being bugged by these drug dealers. I don't want my brother to die. Please stop this. Please get Ryan off the streets. We cannot push this back, take the focus off of this specific enclosed container, which were the bags here in March. Not anything that happened a year before where she may have been involved in, where she was granted more authority. In this case, all she was asked to do was move the bags. Can I ask you one quick that bothers me slightly, which is if we get to the apparent authority issue, that means you've already lost on the scope of consent issue. We have to assume that the scope of the consent she was granting included the authority to search the bag, right? Well, in this case, you're right. I've tried to think about this, and I think they amount to the same thing because the scope of your consent can only go to things that are yours. That's my problem is that if we take it that she told them you can search the bag, isn't that a version of saying I'm holding myself out that it's my bag? In other words, isn't that an additional fact that would support the inference that she did have authority to consent to the search, the very fact that she's saying search it? Well, no, Your Honor, actually not. Because in all the cases, including the ones that the government brought up about the drugs in the container, there was a note saying I got in the container. I actually had use of it. There was something in addition to that. In the Miata case, which is the scope of consent case, her cat was in the apartment. The cops had seen her car parked out there. She said, I live there. So there's always something that's not just the word of the person, but there's always at least some outside evidence in every case I could find that the person did in fact have authority. They say this is my apartment. You can search. They have the key in their hand. There's some other additional piece of information besides just people saying it. I mean, I could say I have authority in every case. Here the question would be is the additional evidence, those phone calls about the prior relationship, would it be fair for the officer to add that to the representation you can search to get to the? No, Your Honor, because there's no mutual use, and they know there's no mutual use. Ms. Davis. The representation you can search is itself ambiguous at best. Because you can search can mean simply I don't care. Go ahead and search it. Not mine. That's true, Your Honor. I could consent to search your briefcase. Yeah. But it wouldn't really, I hope, allow the police to take the contents and pick through it and decide that you committed a crime. One would hope not. Thank you. Okay. Thank you, counsel.